THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JONES LANG LASALLE AMERICAS, INC.,
a Maryland corporation,

                    Plaintiff,

                                          Case No. 1:26-cv-9247

v.

ELIZABETH WALKER TEAGUE, an individual,

                    Defendant.

## COMPLAINT

Plaintiff Jones Lang LaSalle Americas, Inc. ("JLL") brings this action against Defendant

Elizabeth Walker Teague ("Defendant" or "Ms. Teague") and alleges as follows:

## NATURE OF THE ACTION

1. This is a civil action by JLL for breach of contract, breach of a promissory note, and declaratory relief arising from Defendant's abrupt resignation from JLL, her immediate affiliation with a direct competitor in violation of her contractual non-compete obligations, her solicitation of JLL's personnel and clients in violation of her non-solicitation obligations, and her refusal to repay the amounts she owes JLL.

2. Over more than a decade, JLL invested heavily in Ms. Teague and the retail brokerage business she conducted on JLL's behalf, including, since 2022 alone, more than $900,000 in bonus payments and forgivable loan proceeds, including a $600,000 forgivable loan made in 2025, barely one year before her resignation. In exchange, Ms. Teague agreed, among other things, to limited restrictive covenants and to repay the loan if she resigned before it was fully forgiven. As of the filing of this Complaint, Ms. Teague owes JLL $487,831.55 under her Promissory Note, the entire balance of which was accelerated by her resignation and is payable in

full no later than August 5, 2026, and $229,000 in performance bonus repayment obligations that became immediately due and owing upon her resignation, exclusive of interest, attorneys' fees, and costs. JLL is further entitled to offset $178,815 in uncovered support obligations against any amounts Ms. Teague claims. Despite JLL's written demand, Ms. Teague has failed and refused to repay any amount.

3. JLL brings this action to recover the amounts Ms. Teague owes, to enforce the reasonable contractual covenants she accepted in exchange for JLL's investment, and to obtain a declaration of the parties' rights concerning the commission amounts Ms. Teague claims and JLL's contractual rights of offset.

## THE PARTIES

4. Plaintiff JLL is a Maryland corporation with its corporate headquarters and principal place of business at 200 East Randolph Drive, Chicago, Illinois 60601. JLL is thus a citizen of Maryland and Illinois.

5. Defendant Elizabeth Walker Teague is an individual residing in Mobile County, Alabama. Defendant is thus a citizen of Alabama.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between JLL and Defendant, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7. This Court has personal jurisdiction over Defendant because, among other things, Defendant expressly consented to the jurisdiction of the state and federal courts located in Chicago in her Promissory Note; Defendant contracted with JLL, a company headquartered in Chicago, over a period of more than twelve years under an agreement that she agreed would be governed by Illinois law (ICA ¶ 13); the Promissory Note was made and delivered in Chicago and is payable

2

in Chicago; and Defendant's compensation under her agreements with JLL was administered from Illinois.

8.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district, including Defendant's failure to make payment due in this district. Venue is also proper because Defendant consented to venue in the state and federal courts located in Chicago, Illinois. See **Exhibit E**, § 7.

**GENERAL ALLEGATIONS**

**JLL's Business and its Engagement of Ms. Teague**

9.      JLL is a leading professional services firm specializing in real estate and investment management. Among other things, JLL offers commercial real estate brokerage services to its clients throughout the United States, including in Alabama and the surrounding Gulf coast markets. JLL's brokerage business depends on long-term client relationships and the goodwill developed between clients and the brokers whom JLL engages, supports, and funds to serve them.

10.      On or about January 15, 2014, JLL and Ms. Teague entered into an employment agreement (under IRC Section 3508) (the "ICA"), pursuant to which JLL engaged Ms. Teague as a commercial real estate broker in its Mobile, Alabama office. A true and correct copy of the ICA is attached hereto as **Exhibit A** and is incorporated herein by reference.

11.      Under the ICA, Ms. Teague agreed, among other things: that she was "engaged exclusively" by JLL and "owes Company a duty of loyalty" (ICA ¶ 1(c)); to comply with JLL's policies (ICA ¶ 1(a)); to keep JLL's Confidential Information confidential (ICA ¶ 8); to return all JLL documents and property upon termination of her engagement (ICA ¶ 10); and to the non-solicitation covenants described below (ICA ¶ 7).

3

12. The ICA was amended three times, each time for valuable consideration, by an Amendment to Independent Contractor Agreement dated August 1, 2018 (**Exhibit B**); a Second Amendment to Independent Contractor Agreement dated March 22, 2022 (**Exhibit C**); and a Third Amendment to Independent Contractor Agreement dated May 12, 2025 (**Exhibit D**) (collectively with the ICA, the "Agreement"). Each amendment provided that all other terms of the Agreement remained in full force and effect, including the non-solicitation and confidentiality provisions.

**JLL's Substantial Investment in Ms. Teague**

13. Under the Second Amendment, JLL provided Ms. Teague with a $132,000 retention bonus and established a performance bonus program under which Ms. Teague's team could earn up to $625,000 upon achieving annual revenue targets. Ms. Teague received two performance bonus payments consisting of $122,500 paid on or about March 1, 2023, and $225,000 paid on or about March 1, 2025.

14. Each performance bonus payment was expressly conditioned on continued service. Should Ms. Teague leave JLL "for any reason within five (5) years after the date of any performance bonus payment(s)," a prorated portion of the payment "will be immediately due and owing" to JLL "based on the number of full years of service" completed "out of the five (5) year requirement." At Ms. Teague's direction, $25,000 of the March 2025 payment was paid to Ms. Fawcett; Ms. Teague nonetheless remains responsible under the Second Amendment for repayment of the unvested portion of the full payment.

15. Under the Third Amendment, JLL agreed to provide Ms. Teague with a forgivable loan in the amount of $600,000, documented by a Promissory Note dated May 12, 2025 (the "Note"). A true and correct copy of the Note is attached hereto as **Exhibit E** and is incorporated herein by reference. JLL funded the loan in full on May 21, 2025.

4

16. Under Section 2 of the Note, the debt is forgiven "at a rate of six percent (6%) per dollar of cash collected attributable to [Ms. Teague]," beginning April 1, 2025 and continuing through December 31, 2033. Under Section 3 of the Note, if Ms. Teague resigns before the debt is repaid or forgiven in its entirety, "the entire outstanding amount of the Debt will become due immediately and payable within thirty (30) days after the Due Date without further notice or demand," with her resignation date constituting the "Due Date."

17. In Section 5 of the Note, Ms. Teague represented and warranted that the Note "is a legally valid and binding obligation of Maker, enforceable against Maker in accordance with its terms." In Section 7 of the Note, Ms. Teague agreed that the Note is governed by Illinois law, consented to jurisdiction and venue in the state and federal courts located in Chicago, Illinois for "[a]ny action for collection on this Note," and "knowingly and willingly waive[d] a trial by jury."

**Ms. Teague's Restrictive Covenants**

18. Section 7 of the ICA provides that during the Term of the Agreement and for twelve (12) months after a termination of the Agreement by Ms. Teague for any reason, she may not, without JLL's prior written consent, directly or indirectly (i) "solicit from clients of the Company or any of the Company's Affiliates any existing or pending transactions or assignments, or solicit or encourage such clients to discontinue their existing or pending transactions or assignments with the Company or reduce their consideration of the Company for pending transactions or assignments," except that she "is not prohibited from accepting or responding to unsolicited calls or contact, including accepting or responding to requests for proposals and requests for quotes"; or (ii) "solicit or encourage any officer, director, employee, consultant, agent, or independent contractor employed or retained by the Company . . . to leave the employ or retention of Company," "other than through a general solicitation that does not specifically target employees or consultants of the Company."

5

19. Section 7 of the Agreement, as amended by the Third Amendment, further provides:

> During the Term of this Agreement and, if JLL terminates the Agreement for Cause or Contractor terminates the Agreement for any reason, for six (6) months after such termination, Contractor may not, without the prior written consent of the Company, own, manage, operate or control any business, individual, partnership, firm, corporation, limited liability company or other entity that is engaged directly or indirectly in any business line and in any state or territory in which Contractor was engaged on behalf of the Company within two (2) years prior to Contractor's termination from the Company, or serve as an employee or independent contractor to any other person or entity that is engaged, directly or indirectly, in that business.

20. The Third Amendment further provides that "[t]he post-engagement restrictions set forth in this Paragraph shall apply until the Debt set forth in the promissory note(s) described in Exhibit A is fully forgiven (without any repayment by [Ms. Teague])."

21. Within the two years prior to her resignation, Ms. Teague was engaged on JLL's behalf in leasing brokerage, including tenant representation and agency work, in the Gulf coast region, including Alabama, Mississippi, and the Florida panhandle, among other markets.

22. In Section 9 of the ICA, Ms. Teague acknowledged and agreed that the restrictions in Paragraphs 7 and 8 of the ICA are "reasonable and necessary to protect the legitimate interests of Company and the value of the goodwill associated with the operation of the Company" and "do not cause [her] undue hardship"; that any violation "may result in irreparable injury to the Company"; and that JLL "is entitled to injunctive relief, in addition to any other remedies in equity or law." Section 9 further provides that a court of competent jurisdiction may "reduce the scope, duration or geographic area" of any provision found invalid or unenforceable, and that if Ms. Teague violates Paragraph 7 or 8, "the period for which [she] is to be restricted will be suspended during the time that [she] violates the terms," and the remaining period "will recommence on the date that [she] ceases to violate those terms." The restrictions themselves remain in effect during any violation; only the running of the restricted period is suspended.

6

**Ms. Teague's Resignation and Numerous Breaches**

23. On July 6, 2026, Ms. Teague resigned from JLL, effective immediately. At the time of her resignation, the debt under the Note had not been fully forgiven, and both performance bonus payments remained within their five-year repayment periods.

24. Immediately upon her resignation, Ms. Teague affiliated with COUNCIL Real Estate ("Council"), a commercial real estate firm based in Atlanta, Georgia. Council is a direct competitor of JLL engaged in the same brokerage business lines, and operates in the same geographic markets, in which Ms. Teague was engaged on JLL's behalf within the two years preceding her resignation.

25. JLL has learned that Ms. Teague recruited Lisa Fawcett, another broker on JLL's Gulf coast/Alabama team and a named member of Ms. Teague's team under the Second Amendment, to leave JLL and join her at Council, and Ms. Fawcett has done so. Ms. Fawcett resigned on the same day (July 6, 2026) and within an hour of Ms. Teague's resignation.

26. Upon information and belief, since her resignation, Ms. Teague has also solicited JLL clients on behalf of Council with respect to existing or pending transactions or assignments, and has solicited or encouraged JLL clients to discontinue or reduce their business with JLL.

27. Ms. Teague's conduct violates her non-compete and non-solicitation obligations under Section 7 of the Agreement, as amended.

**Ms. Teague's Repudiation of her Repayment Obligations**

28. Ms. Teague's resignation was a resignation before the debt under the Note was repaid or forgiven in its entirety. Accordingly, under Section 3 of the Note, the entire outstanding amount of the debt became immediately due and payable within thirty (30) days after her resignation, that is, by August 5, 2026.

29. After applying all forgiveness to which Ms. Teague is entitled under the Note, including forgiveness equal to six percent of the $688,490.58 in 2026 cash collections attributable to Ms. Teague through her resignation, the outstanding balance of the debt under the Note is $487,831.55 as of August 3, 2026, inclusive of future interest, attorneys' fees, and costs.

30. In addition, because Ms. Teague left JLL within five years of each of her two performance bonus payments, prorated portions of those payments became "immediately due and owing" to JLL upon her resignation, consisting of $49,000 of the March 2023 payment and $180,000 of the March 2025 payment, for a total of $229,000.

31. On July 10, 2026, JLL sent Ms. Teague a letter demanding, among other things, that she immediately cease all activity in violation of her restrictive covenants, confirm her compliance in writing, and remit payment of the amounts owed. A true and correct copy of that letter is attached hereto as **Exhibit F**. Ms. Teague has not ceased her affiliation with Council, has not provided the requested confirmation, has not repaid any amount, and has made clear that she does not intend to comply.

**The Parties' Dispute Over Commissions and JLL's Rights of Offset**

32. Under ICA ¶ 4(a), upon termination of the Agreement for any reason, Ms. Teague is entitled to receive "earned but unpaid commission payments for transactions that close during the Term of this Agreement" only, together with reimbursement of appropriate business expenses incurred during the Term.

33. Under ICA ¶ 4(b) and the "Markets Compensation Program – Transactions" (the "Comp Plan"), which the Agreement incorporates, any additional post-termination payments, including revenue credit for pending transactions on any confirmed protected list, are conditioned upon, among other things, Ms. Teague's execution without revocation of a "Confidential Separation Agreement and General Release," her not violating "any material contractual or ethical

obligations to JLL," and, for pending transactions, closing "within 180 days after the termination date (90 days for retail transactions)," and any such payment is "subject to offset, as permitted by law, for any outstanding loans, company credit card balances or other debts that [Ms. Teague] owes [JLL]." Ms. Teague has not executed a Confidential Separation Agreement and General Release.

34. Ms. Teague also agreed to bear the costs of a transaction manager JLL hired to support her team. Under that arrangement, support costs were funded through a holdback on the team's transaction revenue at an agreed coverage rate. As of the time of Ms. Teague's resignation, the holdback was insufficient to cover $178,815 in support costs attributable to her team, and that amount remains uncovered. Amounts otherwise payable to Ms. Teague are subject to reduction and offset for the uncovered support obligation, consistent with the Comp Plan and the parties' arrangement.

35. Under Section 4 of the Note, upon an Event of Default, JLL "may set off any and all amounts due" to Ms. Teague, "including, without limitation, with respect to commissions, bonuses, and expense reimbursement," against the amounts due from Ms. Teague under the Note, and "may withhold payment of any such amount(s)."

36. Ms. Teague claims that JLL owes her earned but unpaid commissions, including for transactions that have not closed or did not close during the Term of the Agreement. On July 21, 2026, Ms. Teague filed a complaint for declaratory judgment against JLL in the Circuit Court of Mobile County, Alabama, Case No. 02-CV-2026-902086, asserting, among other things, that she is owed commissions under the Agreement.

## CLAIMS FOR RELIEF

### COUNT I
### Breach of Promissory Note

37.     JLL re-alleges and incorporates by reference each and every allegation set forth above as though fully set forth herein.

38.     On or about May 12, 2025, JLL and Ms. Teague entered into a valid and enforceable Promissory Note, pursuant to which JLL loaned Ms. Teague $600,000. Ms. Teague expressly warranted the Note's validity and enforceability.

39.     JLL performed all of its obligations and conditions under the Note.

40.     Ms. Teague resigned before the debt was repaid or forgiven in its entirety, rendering the entire outstanding balance due under Section 3 of the Note payable within thirty days of her resignation. Ms. Teague has repudiated her payment obligation, failing to and refusing to pay any portion of the outstanding balance.

41.     After applying all forgiveness to which Ms. Teague is entitled under the Note, Ms. Teague owes JLL $487,831.55, inclusive of interest accrued through August 3, 2026, and exclusive of further interest, attorneys' fees, and costs, which amount shall bear interest "at the rate of ten percent (10%) per annum" upon default pursuant to Section 4 of the Note.

42.     Pursuant to Section 4 of the Note, Ms. Teague also agreed "to pay on demand all out-of-pocket costs and expenses of Holder (including the reasonable legal fees and out-of-pocket expenses of counsel to Holder) incurred in connection with the collection of the Debt or enforcement of Holder's rights," with such amounts to be "added to and considered part of the Debt." JLL has retained counsel and has incurred, and continues to incur, such fees and costs.

43.     As a direct and proximate result of Ms. Teague's breach of the Note, JLL has been damaged in an amount to be proven at trial, but not less than $487,831.55, plus interest, fees, and costs.

**COUNT II**
**Breach of Contract – Performance Bonus Repayment Obligations**

44.     JLL re-alleges and incorporates by reference each and every allegation set forth above as though fully set forth herein.

45.     The Agreement, including the Second Amendment, is a valid and enforceable contract. JLL performed all of its obligations under the Agreement, including paying Ms. Teague the performance bonus payments described above.

46.     Because Ms. Teague left JLL within five years of each performance bonus payment, prorated portions of those payments ($49,000 and $180,000, respectively) became "immediately due and owing" to JLL upon her resignation. Ms. Teague has failed and refused to repay those amounts and has repudiated her repayment obligations.

47.     As a direct and proximate result, JLL has been damaged in an amount to be proven at trial, but not less than $229,000, plus interest, and JLL is entitled to recover its reasonable attorneys' fees and expenses pursuant to ICA ¶ 17.

**COUNT III**
**Breach of Contract – Non-Solicitation of Personnel (ICA § 7(ii))**

48.     JLL re-alleges and incorporates by reference each and every allegation set forth above as though fully set forth herein.

49.     The Agreement, including Section 7 of the ICA, is a valid and enforceable contract supported by substantial consideration, including the compensation, bonuses, and loan proceeds described above. JLL performed all of its obligations under the Agreement.

50.     Ms. Teague breached Section 7(ii) of the ICA when, within twelve months of her resignation, she "solicit[ed] or encourage[d]" Lisa Fawcett, a broker, "employed or retained by the Company," "to leave the employ or retention of Company" by recruiting Ms. Fawcett to leave JLL and join her at Council.

51.     As a direct and proximate result, JLL has suffered and continues to suffer damages and irreparable harm, including the loss of a producing broker in whom JLL invested, destabilization of its team, and loss of goodwill, in amounts that cannot be fully measured or remedied by money damages. Ms. Teague expressly acknowledged in ICA ¶ 9 that violations of Section 7 may result in "irreparable injury" and that JLL is entitled to "injunctive relief."

## COUNT IV
## Breach of Contract – Non-Solicitation of Clients (ICA § 7(i))

52.     JLL re-alleges and incorporates by reference each and every allegation set forth above as though fully set forth herein.

53.     Upon information and belief, Ms. Teague breached Section 7(i) of the ICA when, within twelve months of her resignation and other than on behalf of JLL, she "solicit[ed] from clients of the Company . . . existing or pending transactions or assignments" on behalf of Council, and "solicit[ed] or encourage[d] such clients to discontinue their existing or pending transactions or assignments with the Company or reduce their consideration of the Company for pending transactions or assignments."

54.     The Agreement, including Section 7 of the ICA, is a valid and enforceable contract supported by substantial consideration, including the compensation, bonuses, and loan proceeds described above. JLL performed all of its obligations under the Agreement.

55. As a direct and proximate result, JLL has suffered and continues to suffer damages and irreparable harm, including loss of client goodwill and business relationships developed at JLL's expense, in amounts that cannot be fully measured or remedied by money damages.

**COUNT V**
**Breach of Contract – Non-Compete (Agreement § 7, as Amended)**

56. JLL re-alleges and incorporates by reference each and every allegation set forth above as though fully set forth herein.

57. The non-compete covenant in Section 7 of the Agreement, as amended by the Third Amendment, is reasonable in scope and duration, is limited to the business lines and territories in which Ms. Teague was actually engaged on JLL's behalf within the two years preceding her termination, and is supported by substantial consideration, including the $600,000 forgivable loan made in direct connection with the Third Amendment.

58. Ms. Teague breached the non-compete covenant when, immediately upon her resignation and before the debt under the Note was fully forgiven, she affiliated with and began to "serve as an employee or independent contractor" of Council, a business "engaged directly or indirectly" in the same "business line" and in the same states and territories "in which [Ms. Teague] was engaged on behalf of the Company within two (2) years prior to [her] termination from the Company."

59. The Agreement, including Section 7 of the ICA, is a valid and enforceable contract supported by substantial consideration, including the compensation, bonuses, and loan proceeds described above. JLL performed all of its obligations under the Agreement.

60. As a direct and proximate result, JLL has suffered and continues to suffer damages and irreparable harm, including loss of the client goodwill, team stability, and competitive position that the covenant was designed to protect, in amounts that cannot be fully measured or remedied

13

by money damages. Pursuant to ICA ¶ 9, the running of the restricted period has been suspended during Ms. Teague's ongoing violation, and JLL is entitled to injunctive relief enforcing the covenant for its full remaining period, or as reformed by the Court.

**COUNT VI**
**Declaratory Judgment (28 U.S.C. §§ 2201–2202)**
**Commissions and Offset**

61.     JLL re-alleges and incorporates by reference each and every allegation set forth above as though fully set forth herein.

62.     An actual, justiciable controversy exists between JLL and Ms. Teague concerning Ms. Teague's claimed entitlement to commissions and other post-termination payments and JLL's contractual rights of offset, as evidenced by, among other things, Ms. Teague's demands and her Alabama declaratory judgment complaint.

63.     JLL requests that the Court declare the parties' rights and obligations, including that (a) under ICA ¶ 4(a), Ms. Teague's commission entitlement upon termination is limited to "earned but unpaid commission payments for transactions that close during the Term of this Agreement" only; (b) any additional post-termination payments, including for pending transactions, are governed by ICA ¶ 4(b) and the Comp Plan and are conditioned upon, among other things, Ms. Teague's execution without revocation of a "Confidential Separation Agreement and General Release," her compliance with her material contractual obligations to JLL, which conditions have not been satisfied, and are subject to the Comp Plan's protected-list procedures and deadlines; and (c) any amounts otherwise due to Ms. Teague are subject to offset against the amounts Ms. Teague owes JLL, including under Section 4 of the Note and ICA ¶¶ 4(b) and 10, and for the $178,815 uncovered support obligation.

64.     A declaration from this Court will resolve the parties' controversy concerning the amounts, if any, owed to Ms. Teague and the application of JLL's offset rights.

14

## **REQUEST FOR RELIEF**

WHEREFORE, JLL requests that judgment be entered against Defendant Elizabeth Walker Teague and that JLL be awarded the following relief:

A. Judgment on Count I in the principal sum of $487,831.55, inclusive of interest accrued through August 3, 2026, plus interest accruing thereafter under the terms of the Note and applicable law, including default interest at ten percent (10%) per annum, together with JLL's costs and expenses of collection, including reasonable attorneys' fees, added to the debt pursuant to Section 4 of the Note;

B. Judgment on Count II in the sum of $229,000, plus applicable interest;

C. Preliminary and permanent injunctive relief enforcing Ms. Teague's post-employment contractual obligations including Section 7 of the Agreement, and restraining Ms. Teague from violating her non-compete and non-solicitation obligations for the full restricted periods;

D. Damages caused by the breach of Defendant's non-compete and non-solicit obligations in amount to be determined through discovery;

E. A declaration of the parties' rights and obligations as set forth in Count VI;

F. JLL's reasonable attorneys' fees and expenses pursuant to Section 4 of the Note and ICA ¶ 17;

G. Pre- and post-judgment interest as allowed by law;

H. Costs of court; and

I. Such other and further relief as this Court deems just and proper.

Dated: August 3, 2026

Respectfully submitted,

JONES LANG LASALLE AMERICAS, INC.

By: */s/ Riley C. Mendoza*
 One of Its Attorneys

Riley C. Mendoza
Grecia M. Sáenz
**SHOOK, HARDY & BACON L.L.P.**
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
(312) 704-7700
rmendoza@shb.com
gsaenzhamilton@shb.com

***Attorneys for Plaintiff***
***Jones Lang LaSalle Americas, Inc.***

16

# Exhibit A

## INDEPENDENT CONTRACTOR AGREEMENT
### (IRC SECTION 3508)

THIS INDEPENDENT CONTRACTOR AGREEMENT ("**Agreement**"), dated as of January 15, 2014 ("Effective Date"), by and between **JONES LANG LASALLE AMERICAS, INC.**, a Maryland company ("**JLL**"), and Elizabeth Walker Teague, an individual and resident of Mobile, Alabama ("**Contractor**").

JLL and Contractor desire Contractor to provide services to JLL pursuant to the terms and conditions set forth below:

### 1.     Engagement of Services.

(a)     This Agreement is contingent on Contractor's successful completion of a background check and a drug test in compliance with JLL's Background Investigations and Drug Screening policies. Contractor also agrees to comply with all other JLL policies, including but not limited to JLL's Code of Business Ethics, copies of which are available to Contractor on JLL's intranet site.

(b)     Except as disclosed to JLL in writing prior to the Effective Date, Contractor represents that Contractor is not bound by any restrictive covenants, court orders, laws or regulations, such as non-solicitation, confidentiality or non-compete agreements, or other obligations or commitments of any kind, that would prevent, restrict or interfere with Contractor's performance of all duties and services contemplated hereunder. Contractor is encouraged to seek Contractor's own legal counsel for clarification of any such restrictions or obligations. Contractor agrees not to violate any such obligations or restrictions while performing any services on behalf of the Company.

(c)     Contractor acknowledges and agrees that Contractor's primary duty for the Company is making sales or obtaining orders or contracts for commercial real estate brokerage services for which consideration will be paid by the Company's clients or other third parties. Contractor also acknowledges and agrees that he will customarily and regularly be engaged away from the Company's place of business (including away from any home office that Contractor might maintain), and Contractor will perform services on behalf of the Company at the client's place of business, at targeted transaction sites, or otherwise away from Company's regular place of business. Contractor agrees that Contractor is engaged exclusively by Company and owes Company a duty of loyalty, and that unless authorized by Company in writing, Contractor may not perform similar services on behalf of any other entity or for Contractor's own account. Contractor shall be allowed to use the external title of Vice President of Company.

(d)     Contractor agrees to comply with all provisions of applicable real estate licensing law. Without limiting the foregoing, (i) Contractor agrees that Contractor's licensed activities will be supervised by the designated or qualifying broker, broker of record or other supervising broker, to the extent required by, and in accordance with, state law; (ii) Contractor's compensation will be as provided in Exhibit A to this Agreement; and (iii) Contractor's duties will be as described in this Agreement, as supplemented by Contractor's managers, supervising broker or a designated representative of the Company from time to time.

### 2.     Independent Contractor.

(a)     Contractor is an independent contractor and not an employee of the Company or any of its Affiliates. Contractor retains the sole and absolute discretion and judgment in the timing, manner and means of carrying out Contractor's real estate brokerage services. This Agreement does not create a partnership, agency or joint venture between the parties and, except as specifically authorized by Company, the Company shall not be liable for any obligation incurred by Contractor. Except as the Company approves in advance in writing, Contractor is not authorized to enter into any agreement or sign any document on Company's behalf and may not bind Company to any contract, agreement, engagement or transaction.

(b) Contractor and Company acknowledge and agree that the engagement of services between Contractor and Company under this Agreement complies with Section 3508 of the Internal Revenue Code of 1986, as amended, so that for federal tax purposes the Company is not the employer of Contractor and Contractor is not an employee of the Company or any entity that is directly or indirectly controlled by or under common control of the Company during the Term of this Agreement ("Affiliates"). Contractor represents and agrees that: (i) Contractor is now, and during the Term of this Agreement will continue to be, a licensed real estate agent under the state law(s) under which Contractor provides real estate services and such other states as required pursuant to the Company's business activities; (ii) substantially all of the remuneration for services performed by Contractor as a real estate agent is directly related to sales or other output (including the performance of services) and is not related to the number of hours worked; (iii) Contractor is responsible for paying federal, state and local income taxes, estimated income taxes, employment taxes, FICA and self-employment taxes and any and all other taxes incident to or levied upon the compensation earned by Contractor under this Agreement; and (iv) none of the taxes referred to in section (iii) of this paragraph shall be paid by the Company or withheld by the Company from monies due from the Company to Contractor under this Agreement, and Contractor agrees to indemnify Company for any taxes, withholdings or penalties that Company incurs as a result of the classification of Contractor as an independent contractor, including its treatment of compensation.

3. **Compensation, Expenses & Benefits.** JLL will provide Contractor compensation, expense reimbursement, and benefits consistent with this Agreement and the attached Exhibit A. Contractor agrees that revenue for any and all commercial real estate brokerage activities in which Contractor is involved during the Term of this Agreement belong to Company and Contractor will be paid Contractor's share of that revenue consistent with this Agreement.

(a) Contractor is eligible to participate in the Company's benefits plans offered to the Company's independent contractors, as modified from time to time, and which presently include medical, dental, vision and disability benefit plans, and the Employee Assistance Program (EAP). Except as provided in this Agreement, Contractor is not eligible to participate in Company's other benefit plans, and Contractor waives any rights or benefits afforded to Company employees, including but not limited to 401(k), employee stock purchase plan, paid time off ("PTO"), holidays, or any other employee benefit, plan, policy or program.

(b) The Company believes that the health and well-being of its Contractors are essential to promoting effective and efficient services on behalf of the Company and, therefore, to the Company's success. The Company therefore recommends that Contractor take the time necessary during the day for meals and rests, and that Contractor take time off from work. While Contractor is excluded from the PTO policy, and does not accrue or earn any PTO, Contractor may take unpaid time off as needed to address illness. If Contractor has a serious health condition or needs to care for the serious health condition of a member of his immediate family, Company will provide Contractor with up to 90 days in any 12 month period of unpaid leave. An unpaid leave of absence of up to 90 days will also be provided to a Contractor to care for his newborn child, newly adopted child or a child that Contractor begins to care for through foster care. A leave of absence is subject to Company's receipt of appropriate medical documentation and Company approval.

4. **Term of Agreement.**

(a) This Agreement will begin on the Effective Date and will terminate at any time upon written notice from JLL or upon thirty (30) days written notice from Contractor ("Term"). Upon a termination of this Agreement for any reason, Contractor is entitled to receive, consistent with this Agreement and applicable law (i) earned but unpaid commission payments for transactions that close during the Term of this Agreement only; and (ii) reimbursement for appropriate business expenses that Contractor incurs during the Term of this Agreement.

(b) Upon a termination of this Agreement by Contractor for any reason or by Company without Cause, and if Contractor executes and does not revoke a Confidential Separation Agreement and General Release to be drafted by Company, Contractor is entitled to receive the additional payments and benefits provided by the Markets Retail Compensation Program ("Comp Plan") then in effect, except that any payment is subject to offset, as

permitted by law, for any outstanding loans, company credit card balances or other debts that Contractor owes Company.

(c) Except as provided in this Paragraph 4, Contractor agrees that any compensation or benefits Contractor receives relating to termination of this Agreement is governed solely by this Agreement, and Contractor is not eligible for any other compensation or benefits, including, without limitation, severance benefits under the Jones Lang LaSalle Incorporated Severance Pay Plan, as amended from time to time.

5. **Termination with Cause.** "Termination with Cause" means the termination by the Company of this Agreement because of Contractor's:

(a) Material breach of a provision of this Agreement;

(b) Sustained underperformance or refusal to perform the duties assigned under this Agreement;

(c) Material breach of the Company's Code of Business Ethics or policies;

(d) Commission of (i) an act or omission that is willful misconduct or gross negligence, (ii) an act that results in a conviction of a felony or any lesser crime involving fraud, theft, dishonesty or violence, (iii) an act of dishonesty that adversely affects the business of the Company or its Affiliates; or

(e) Suspension or revocation of Contractor's real estate license.

6. **Termination upon Death or Disability.** This Agreement will terminate automatically on the date of Contractor's death or Disability. No compensation is payable after Contractor's death or Disability other than: (i) commission payments as provided by the Comp Plan then in effect; and (ii) reimbursement for appropriate business expenses that Contractor incurs during the Term of this Agreement, but only to the date of Contractor's death or Disability. Any compensation payable as a result of Contractor's death will be paid to Contractor's designated beneficiary.

For purposes of this Agreement, "Disability" excludes a Termination with Cause and means a physical or mental condition resulting from any physical or mental impairment that renders Contractor incapable of fully performing his duties under this Agreement, even with reasonable accommodation, and that is expected to result in death, or that has lasted or is expected to last for a continuous period of at least four (4) months in any twelve (12) month period and that results in Contractor qualifying for Social Security disability benefits. All amounts payable upon the Disability of Contractor will be payable to Contractor or, in the discretion of the Company, to Contractor's legal guardian or representative.

7. **Nonsolicitation.** During the Term of this Agreement and for 12 months after termination of the Agreement if terminated by Contractor for any reason or by Company with Cause, Contractor may not without prior written consent of the Company, personally or as an employee, stockholder, director, investor, owner, consultant, manager, member, associate, partner, agent, independent contractor or otherwise, or by means of any corporate or other device: (i) other than on behalf of the Company, solicit from clients of the Company or any of the Company's Affiliates any existing or pending transactions or assignments, or solicit or encourage such clients to discontinue their existing or pending transactions or assignments with the Company or reduce their consideration of the Company for pending transactions or assignments, except that Contractor is not prohibited from accepting or responding to unsolicited calls or contact, including accepting or responding to requests for proposals and requests for quotes; or (ii) solicit or encourage any officer, director, employee, consultant, agent, or independent contractor employed or retained by the Company or any of its Affiliates during the term of this Agreement to leave the employ or retention of Company or its Affiliates, other than through a general solicitation that does not specifically target employee's or consultants of the Company.

8. **Confidentiality.** Contractor agrees that except as required by law or court order Contractor will keep confidential all Confidential Information Contractor has except as authorized by the Company in writing. "Confidential Information" means information that is designated confidential or proprietary by Company, whether or not it is expressly stamped or identified as confidential, including information regarding the Company and its Affiliates, and Company clients, relating to: (a) operations, assets, liabilities or financial condition; (b) pricing, sales, marketing, costs, joint ventures and business alliances; (c) client lists or other information regarding current or prospective clients, including information regarding their identities, contact persons and purchasing patterns and terms and conditions of any contractual relationship; (d) employees or sales representatives, compensation and compensation plans; (e) business plans, marketing plans or strategies, unique business methods, trade secrets, and proprietary information; and (f) any other types of information typically or regularly considered or treated as confidential or proprietary.

9. **Remedies.** Contractor acknowledges that: (a) the restrictions in Paragraphs 7 and 8 are (i) reasonable and necessary to protect the legitimate interests of Company and the value of the goodwill associated with the operation of the Company, and (ii) do not cause Contractor undue hardship, and (b) any violations of any provision of Paragraphs 7 and 8 may result in irreparable injury to the Company and therefore, the Company is entitled to injunctive relief, in addition to any other remedies in equity or law to which the Company may be entitled. The parties agree that if a court or tribunal of competent jurisdiction finds that any provision in Paragraph 7 or 8 is invalid or unenforceable, then that court or tribunal will have the power to reduce the scope, duration or geographic area of the provision, to delete specific words or phrases or to replace any invalid or unenforceable provision with a provision that is valid and enforceable and that comes closest to expressing the intent of the invalid or unenforceable provision. Paragraphs 7 and 8 will be enforceable as so modified. If Contractor violates Paragraph 7 or 8, the period for which Contractor is to be restricted will be suspended during the time that Contractor violates the terms and the remaining period for which the restriction applies will recommence on the date that Contractor ceases to violate those terms.

10. **Return of Documents and Property.** Upon termination of Contractor's engagement with the Company for any reason, Contractor will return to the Company all Company-related documents in Contractor's possession or control, including but not limited to documents that include or reflect Confidential Information as identified in Paragraph 8, whether in electronic or other format. At Company's request, Contractor will certify in writing Contractor's full compliance with this Paragraph 10. Upon termination of Contractor's engagement with the Company for any reason, Contractor also will immediately return to the Company any property of the Company in Contractor's possession or control, including but not limited to mobile phone(s), computer(s), iPhone or other similar device(s), compensation manual(s) and credit cards (it being understood that the balance of such credit cards that are not supported by appropriate expense reports within 30 days after termination of the engagement are the sole obligation of Contractor). The actual value of the property not yet returned under this paragraph and the balance on any corporate credit cards for which the Contractor is not entitled to reimbursement from the Company may be set off from any payment otherwise due to Contractor under this Agreement.

11. **Intellectual Property.** Contractor agrees to assign to Company Contractor's entire right, title and interest in any invention or idea, patentable or not, that Contractor creates or conceives of (i) during Contractor's engagement with Jones Lang LaSalle and for six (6) months thereafter and (ii) which relates in any manner to the Company's actual or anticipated business, research or development, or is suggested by or results from any task Company assigned to Contractor or any work Contractor performed on behalf of Company. Contractor also agrees to promptly disclose to Company's Legal Services any invention or idea contemplated above, and upon request, Contractor will execute a specific assignment of title to Company, and do anything else reasonably necessary to enable Company at its expense to secure a patent therefore in the United States and in foreign countries.

12. **Successors and Assigns.** This Agreement benefits and binds the Company, its successors and assigns, and Contractor and Contractor's heirs, executors, administrators and legal representatives. Contractor may not commute, anticipate, encumber, assign or dispose of Contractor's right to any payment under this Agreement before receipt without JLL's written agreement and may not assign Contractor's obligations under this Agreement.

Page 4 of 6

13. **Governing Law.** This Agreement is governed by the laws of the State of Illinois.

14. **Jury Trial Waiver.** The parties knowingly and willingly waive a trial by jury in any dispute arising out of or in any way related to this Agreement.

15. **Waiver.** The failure of either party to insist in any one or more instances upon performance of any term, covenant or condition of this Agreement does not waive future performance of the term, covenant or condition, which continues in full force and effect.

16. **Severability and Other Rules of Construction.** Each provision of this Agreement must be interpreted where possible in a manner necessary to sustain its legality and enforceability. The unenforceability of any part or provision of this Agreement in a specific situation does not affect the enforceability of (i) that part or provision in another situation or (ii) the other parts or provisions of this Agreement if they could then conform to the purposes of this Agreement and the law.

17. **Fees and Expenses.** If there is any litigation to enforce this Agreement, the prevailing party is entitled to recover its reasonable attorneys' fees and expenses.

18. **Consideration.** Contractor agrees that Company's promises in this Agreement provide good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged. Contractor further agrees that Contractor enters into this Agreement voluntarily and that Contractor bargained for the terms of the consideration of this engagement and, that by signing below, Contractor is aware of his right to consult an attorney before signing this Agreement and has either consulted an attorney or elected not to exercise that right.

19. **Counterparts.** This Agreement may be executed in counterparts, any of which may be executed and delivered via facsimile or other electronic delivery, each of which shall be deemed an original, and all of which, taken together, shall constitute one and the same instrument.

20. **Entire Agreement.** This Agreement, including the attached Exhibit A, embodies the entire agreement and understanding between the parties with respect to the subject matter and supersedes all prior agreements and understandings between the Company and Contractor with respect to this subject matter. This Agreement may be amended only by written agreement signed by each party.

CONTRACTOR

JONES LANG LASALLE AMERICAS, INC.

By: _____

Name: _Steve Yensel_

Title: _Executive Vice President_

Page 5 of 6

## EXHIBIT A

### Commission

Contractor is paid consistent with the Comp Plan, as modified from time to time, and which presently provides:

- Contractor will be paid commissions, calculated bi-weekly, based on the commission percentages below, and payable once any annual draw has been covered by attributable revenue:

| Revenue Credit Allocated to Contractor | Commission % Against Allocated Revenue Credit |
|---|---|
| $0 - $300,000 | 50% |
| $300,001-$750,000 | 60% |
| $750,001+ | 65% |

- Commission percentages are calculated based on transaction revenue actually received and allocated to Contractor, net of deal costs, and cumulative deficit attributed to Contractor. Contractor is eligible for commission payments only if transactions can be recognized as income consistent with GAAP the Company's regular accounting practices.

- Deficits created by failure to cover any draw will carry forward from year to year.

- Revenue credit is attributable to Contractor consistent with Contractor's participation in generating the revenue and executing the work, as determined by the Contractor's transaction team, subject to JLL's approval.

### Signing Bonus

Contractor shall be paid a signing bonus of Twenty-Five Thousand Dollars ($25,000.00) within 45 days after the Effective Date, assuming Contractor is still actively engaged under this Agreement on the date of payment. Receipt of such bonus is contingent upon Contractor meeting the following criteria on or before December 31, 2014: (a) attend at least three (3) monthly brokerage meetings; (b) source and attend at least ten (10) client meetings; and (c) build relationships with the local tenant representation team and other brokers on the national retail platform. The signing bonus will vest over four years from 2014 through 2017 such that if Company terminates this Agreement for Cause or Contractor terminates the Agreement for any reason prior to December 31, 2017, the unvested portion of the bonus shall be immediately due and payable from Contactor.

### Expenses

JLL will reimburse Contractor for costs incurred by Contractor on JLL's behalf in accordance with the terms of JLL's Corporate Travel and Expense policy, which may be modified from time to time.

Certain pre-approved costs that Contractor incurs for client entertainment, travel, charitable contributions, and legal transaction-related costs are funded by transaction revenue consistent with JLL's Transaction Related Expense or "Deal Cost" policy, which may be modified from time to time.

# Exhibit B

## AMENDMENT TO INDEPENDENT CONTRACTOR AGREEMENT
## (IRC SECTION 3508)

THIS AMENDMENT TO INDEPDENT CONTRACTOR AGREEMENT ("Amendment"), dated effective as of August 1, 2018 ("Effective Date"), by and between JONES LANG LASALLE AMERICAS, INC. ("JLL" or "Company"), and Elizabeth Walker Teague, an individual and resident of Mobile, Alabama ("Contractor").

WHEREAS, Contractor and Jones Lang LaSalle Americas, Inc. entered into an Independent Contractor Agreement dated as of January 15, 2014 ("**Agreement**");

WHEREAS, the parties now mutually desire to amend certain terms of the Agreement as of the Effective Date;

NOW, THEREFORE, JLL and Contractor hereby agree as follows:

1.    As of the Effective Date, Exhibit A to the Agreement is deleted in its entirety and replaced with the attached Exhibit A.

All other terms and conditions of the Agreement remain in full force and effect, including without limitation, all terms related Contractor's agreement to abide by the Company's polices and procedures and the non-solicitation and confidentiality clauses in the Agreement. By mutual execution below, the parties acknowledge agreement and consent to the terms and conditions of this Amendment.

**ELIZABETH WALKER TEAGUE**

**JONES LANG LASALLE AMERICAS, INC.**

By: _Nancy Norman_

Name: _Senior Vice President_

Title: _____

1

## EXHIBIT A

### Commission

Contractor is paid consistent with the Comp Plan, as modified from time to time, and which presently provides:

-   Contractor will be paid commissions, calculated bi-weekly, based on the commission percentages below, and payable once any annual draw has been covered by attributable revenue:

| Annual Revenue Credit Allocated to Contractor | Commission % Against Allocated Revenue Credit |
| --- | --- |
| $0 - $300,000 | 50% |
| $300,001-$750,000 | 60% |
| $750,001+ | 65% |

-   Commission percentages are calculated based on transaction revenue actually received and allocated to Contractor, net of deal costs, and cumulative deficit attributed to Contractor. Contractor is eligible for commission payments only if transactions can be recognized as income consistent with GAAP the Company's regular accounting practices.

-   Deficits created by failure to cover any draw will carry forward from year to year.

-   Revenue credit is attributable to Contractor consistent with Contractor's participation in generating the revenue and executing the work, as determined by the Contractor's transaction team, subject to JLL's approval.

### Signing Bonus

Contractor shall be paid a signing bonus of One Hundred Thousand Dollars ($100,000.00) within 30 days after the Effective Date, assuming Contractor is still actively engaged under this Agreement on the date of payment. Receipt of such bonus is contingent upon Contractor meeting the following criteria on or before December 31, 2019: (a) source and attend at least ten (10) client meetings; (b) obtain twelve (12) executed listing agreements; and (c) build relationships with Southeast Retail Brokerage team and other brokers on the national platforms. The signing bonus will vest over five (5) years from 2018 through 2023 such that if Company terminates this Agreement for Cause or Contractor terminates the Agreement for any reason prior to the fifth (5th) anniversary of the date of payment, the unvested portion of the bonus shall be immediately due and payable from Contactor to Company.

### Performance Bonus

Contractor will be eligible to earn additional compensation of up to a maximum cumulative payout of Two Hundred Fifty Thousand Dollars ($250,000.00) in the form of performance bonus payments based upon achieving the annual revenue hurdles below:

| Annual Revenue Hurdle | Performance Bonus Payment |
| --- | --- |
| $1,200,000 | $100,000 |
| $1,500,000 | $150,000 |

2

Contractor may achieve the revenue hurdles in any order through December 31, 2025, though there is a maximum of one payment in any year and one payment per achievement hurdle. The revenue hurdles are based on annual team revenue, which includes Contractor, Leigh Dale Younce, Guy Oswalt, and retail transaction revenue only for Allen Garstecki, plus any future recruits as agreed in writing by Contractor and Company for which upfront capital is not required. For Employee to be eligible to receive any portion of the performance bonus, Employee must be employed with the Company on the date it is paid. Performance bonus payments will vest over five (5) years such that if Company terminates this Agreement for Cause or Contractor terminates the Agreement for any reason prior to the fifth (5th) anniversary of the date of any payment, the unvested portion of the bonus shall be immediately due and payable from Contactor to Company

## Expenses

JLL will reimburse Contractor for costs incurred by Contractor on JLL's behalf in accordance with the terms of JLL's Corporate Travel and Expense policy, which may be modified from time to time.

Certain pre-approved costs that Contractor incurs for client entertainment, travel, charitable contributions, and legal transaction-related costs are funded by transaction revenue consistent with JLL's Transaction Related Expense or "Deal Cost" policy, which may be modified from time to time.

3

# Exhibit C

## SECOND AMENDMENT TO INDEPENDENT CONTRACTOR AGREEMENT

THIS SECOND AMENDMENT TO INDEPENDENT CONTRACTOR AGREEMENT ("Amendment"), dated effective as of March 22, 2022 ("Amendment Effective Date"), by and between JONES LANG LASALLE AMERICAS, INC., a Maryland corporation ("JLL" or the "Company"), and Elizabeth Walker Teague, an individual and resident of Mobile, Alabama ("Contractor").

WHEREAS, Contractor and JLL entered into an Independent Contractor Agreement (IRC Section 3508) dated as of January 15, 2014, which was amended by an Amendment to Independent Contractor Agreement dated as of August 1, 2018 (as amended, the "Agreement"); and

WHEREAS, the parties now mutually desire to amend certain terms of the Agreement as of the Amendment Effective Date in order to provide additional compensation to Contractor;

NOW, THEREFORE, JLL and Contractor hereby agree as follows:

1.      Section 7 of the Agreement is hereby amended to include "**Non-Compete**" in its title and to include the following:

> During the Term of this Agreement and, if JLL terminates the Agreement for Cause or Contractor terminates the Agreement for any reason before the Retention Bonus described in Exhibit A (the "Retention Bonus") has fully amortized, for six (6) months after such termination, Contractor may not, without the prior written consent of the Company, own, manage, operate or control any business, individual, partnership, firm, corporation, limited liability company or other entity that is engaged directly or indirectly in any business line and in any state or territory in which Contractor was engaged on behalf of the Company within two (2) years prior to Contractor's termination from the Company, or serve as an employee or independent contractor to any other person or entity that is engaged, directly or indirectly, in that business. Nothing in this paragraph limits, prohibits or restricts Contractor, during Contractor's engagement with the Company or otherwise, from owning, directly or indirectly, solely as an investment, publicly-traded securities of an entity that engages in JLL's business, so long as Contractor does not, collectively or beneficially, own more than one percent (1%) of any class of securities of such entity or making passive investments in hedge, private equity or mutual funds or similar investment vehicles so long as such investments are consistent with the Company's Global Corporate Risk Management Guideline 29 on Managing Personal Investments in Commercial Real Estate. The post-engagement restrictions set forth in this Paragraph shall apply until the Retention Bonus has fully amortized.

2.      Section 8 of the Agreement is hereby amended to include the following:

> Contractor shall maintain total confidentiality concerning the terms of this Agreement and agrees not to disclose the matters contained herein to any other person or entity; provided, however, that Contractor may discuss this Agreement in confidence with members of Contractor's immediate family and legal, financial and tax advisors.

3.      Contractor's Signing Bonus, as set forth on Exhibit A to the Agreement, is hereby deleted in its entirety and replaced with the following:

### Retention Bonus

The Company will provide Contractor with a total retention bonus in the amount of One Hundred Thirty-Two Thousand Dollars ($132,000). Within ninety (90) days of the Amendment Effective Date, Contractor will receive a payment in the amount of $100,000. To be eligible to receive this retention bonus payment, Contractor must be engaged with the Company on the date it is paid. The remaining $32,000 of the retention bonus represents the unamortized balance of Contractor's prior

signing bonus, which was previously paid to Contractor. The retention bonus will amortize at a rate of seven percent (7%) of cash collected attributable to Contractor on an annual basis and will extend through 2030. In the event that Contractor leaves the Company for any reason before the retention bonus is fully amortized, Contractor will promptly repay to the Company the unamortized portion of the retention bonus. Contractor understands and agrees that to the extent any portion of the retention bonus does not qualify for 1099 tax treatment under Section 3508 of the Internal Revenue Code, Contractor will be responsible for paying applicable payroll taxes and withholdings on the unqualified income.

4.      Contractor's Performance Bonus, as set forth on Exhibit A to the Agreement, is hereby deleted in its entirety and replaced with the following:

**Performance Bonus**

Beginning on January 1, 2022, Contractor's Team is eligible to earn additional compensation of up to a maximum cumulative payout of $625,000 in the form of a performance bonus upon Contractor's Team (defined as Contractor, Hugo Isom, Martha Alvord-Henry, Lisa Fawcett, Caroline Luscher, McKenna O'Donnell, and any future recruits where upfront capital is not required) achieving the annual gross revenue hurdles set forth below:

| Team Annual Revenue Hurdle | Performance Bonus |
|---|---|
| $3,500,000 | $175,000 |
| $4,000,000 | $200,000 |
| $4,500,000 | $250,000 |

Performance bonus revenue thresholds are based on the calendar year(s). The hurdles may be achieved in any order, but there is a maximum of one (1) payment in any one (1) year and a maximum of one (1) payout per hurdle. The respective hurdles must be achieved by December 31, 2030, in order to be eligible to receive the corresponding performance bonus. Any performance bonus shall be payable in no event later than the end of the first quarter of the year following the date that the revenue hurdle is reached and verified. For Contractor to be eligible to receive any portion of the performance bonus, Contractor must be engaged with the Company on the date it is paid. Performance bonus payments are allocated at the discretion of Company leadership and the Team. Should Contractor leave the Company for any reason within five (5) years after the date of any performance bonus payment(s), a prorated portion of the payment(s) will be immediately due and owing by Contractor to the Company based on the number of full years of service Contractor has completed out of the five (5) year requirement.

5.      All other terms and conditions of the Agreement remain in full force and effect, including, without limitation, all terms related to Contractor's agreement to abide by the Company's policies and procedures and the nonsolicitation and confidentiality clauses in the Agreement. By mutual execution below, the parties acknowledge agreement and consent to the terms and conditions of this Amendment.

**ELIZABETH WALKER TEAGUE**

_____

**JONES LANG LASALLE AMERICAS, INC.**

By: _____

Name: _Michael J. Sivenwright_

Title: _Market Director_

# Exhibit D

## THIRD AMENDMENT TO INDEPENDENT CONTRACTOR AGREEMENT

THIS THIRD AMENDMENT TO INDEPENDENT CONTRACTOR AGREEMENT ("Amendment"), dated as of May 12, 2025 ("Amendment Effective Date"), by and between JONES LANG LASALLE AMERICAS, INC., a Maryland corporation ("JLL" or "Company"), and Elizabeth Walker Teague, an individual and resident of Mobile, AL ("Contractor").

WHEREAS, Contractor and JLL entered into an Independent Contractor Agreement (IRC Section 3508) dated as of January 15, 2014, which was amended by an Amendment to Independent Contractor Agreement dated as of August 1, 2018 and a Second Amendment to Independent Contractor Agreement dated as of March 22, 2022 (as amended, the "Agreement"); and

WHEREAS, the parties now mutually desire to amend certain terms of the Agreement as of the Amendment Effective Date in order to provide additional compensation to Contractor;

NOW, THEREFORE, JLL and Contractor hereby agree as follows:

1.      Contractor's Non-Compete, as set forth Section 7 of the Agreement, is hereby deleted in its entirety and replaced with the following:

During the Term of this Agreement and, if JLL terminates the Agreement for Cause or Contractor terminates the Agreement for any reason, for six (6) months after such termination, Contractor may not, without the prior written consent of the Company, own, manage, operate or control any business, individual, partnership, firm, corporation, limited liability company or other entity that is engaged directly or indirectly in any business line and in any state or territory in which Contractor was engaged on behalf of the Company within two (2) years prior to Contractor's termination from the Company, or serve as an employee or independent contractor to any other person or entity that is engaged, directly or indirectly, in that business. Nothing in this paragraph limits, prohibits or restricts Contractor, during Contractor's engagement with the Company or otherwise, from owning, directly or indirectly, solely as an investment, publicly-traded securities of an entity that engages in JLL's business, so long as Contractor does not, collectively or beneficially, own more than one percent (1%) of any class of securities of such entity or making passive investments in hedge, private equity or mutual funds or similar investment vehicles so long as such investments are consistent with the Company's Global Corporate Risk Management Guideline 29 on Managing Personal Investments in Commercial Real Estate. The post-engagement restrictions set forth in this Paragraph shall apply until the Debt set forth in the promissory note(s) described in Exhibit A is fully forgiven (without any repayment by Contractor).

2.      Exhibit A to the Agreement is hereby amended to include the following:

**<u>Forgivable Loan</u>**

Within ninety (90) days after the Amendment Effective Date, JLL will provide Contractor with a forgivable loan in the amount of $600,000 pursuant to the terms of a separate promissory note to be provided by the Company.

**<u>Performance Incentive Payment</u>**

Contractor is eligible to earn additional compensation in the amount of $600,000 in the form of a single performance incentive payment upon Contractor's Team (defined as the Gulf/Alabama Retail Team, defined in accordance with the Company's standard accounting practices) achieving $15,000,000 in cumulative gross revenue (beginning on January 1, 2025). The revenue hurdle must

1

be achieved by December 31, 2033, in order to be eligible to receive the performance incentive payment. The performance incentive payment will take the form of a forgivable loan, pursuant to the terms of a separate promissory note to be provided by the Company, and will be paid in the quarter following the date that the revenue hurdle is reached and verified. For Contractor to be eligible to receive any portion of the performance incentive payment, Contractor must be engaged with the Company on the date it is paid.

3.      Contractor's Performance Bonus, as set forth on Exhibit A to the Agreement, is hereby amended to provide that Contractor is no longer eligible to earn any performance bonus payments.

4.      All other terms and conditions of the Agreement remain in full force and effect, including, without limitation, all terms related to Contractor's agreement to abide by the Company's policies and procedures and the non-solicitation and confidentiality clauses in the Agreement. By mutual execution below, the parties acknowledge agreement and consent to the terms and conditions of this Amendment.

**ELIZABETH WALKER TEAGUE**

**JONES LANG LASALLE AMERICAS, INC.**

By: _____

Name:   Tim McCarthy

Title:   Executive Managing Director

# Exhibit E

**PROMISSORY NOTE**

$1,200,000                                                                                         Chicago, Illinois
                                                                                                  May 12, 2025


Elizabeth Walker Teague ("**Maker**") executes this Promissory Note ("**Note**") in favor of Jones Lang LaSalle Americas, Inc., a Maryland corporation (or its successors and assigns) ("**Holder**"). Maker acknowledges that as part of the consideration for Holder to enter into an Amendment to Independent Contractor Agreement with Maker dated May 12, 2025 (as amended, the "**Agreement**"), Holder agrees to make a cash loan to Maker subject to the terms and conditions of this Note and the Agreement. Maker agrees to repay the Debt (as defined below) under the terms of this Note.

1.      **The Debt**

Holder agrees to make a cash payment to Maker in the gross amount of Six Hundred Thousand Dollars ($600,000) (the "**Principal**"). In addition, Holder agrees to make an additional cash payment to Maker in the amount of $600,000, on the terms set forth in the Agreement, in the event that Maker's Team (as defined in the Agreement) achieves $15,000,000 in cumulative gross revenue (beginning on January 1, 2025). Any such additional cash payment will be added to the Principal. Interest shall accrue annually on the balance of the Debt from the date Holder makes the payment to Maker at the IRS required minimum rate for employee loans as of such date. Interest will be calculated annually and added to the unpaid Principal then outstanding (the "**Debt**").

2.      **Debt Forgiveness**

IN SETTLEMENT OF THE DEBT AND FOR VALUE RECEIVED, Maker and Holder agree that the Debt will be forgiven at a rate of six percent (6%) per dollar of cash collected attributable to Maker, beginning on April 1, 2025 and continuing through December 31, 2033. Forgiveness will be calculated once per calendar year, no later than March 1 of the following year, and/or, in the event of an earlier termination of the Agreement, on the termination date. Absent written agreement between the parties otherwise, in the event of multiple loan payments, Holder will apply forgiveness in the order in which the payments were made (i.e., the first payment will be forgiven in full before any subsequent payments are forgiven). Holder will treat the Debt as it is forgiven as 1099 income, and Maker is required to pay all associated taxes in accordance with Maker's status as an independent contractor.

3.      **Repayment**

If the Debt is not repaid or forgiven in its entirety by December 31, 2033, or if Maker resigns, dies, becomes Disabled, or is terminated with Cause under the Agreement (as those terms are defined in the Agreement) (together, the "**Due Date**") before the Debt is repaid or forgiven in its entirety, the entire outstanding amount of the Debt will become due immediately and payable within thirty (30) days after the Due Date without further notice or demand.  If, prior to December 31, 2033, Holder terminates Maker's engagement without Cause under the Agreement before the Debt is repaid or forgiven in its entirety, the Debt will be forgiven, provided that Maker executes and does not revoke a Confidential Separation Agreement and General Release in a form and substance acceptable to Holder in its sole discretion. Subject to the other terms and conditions hereof, Maker may voluntarily prepay all or any portion of the Debt from time to time outstanding, without premium or penalty.

4.      **Default**

Any of the following shall constitute an event of default ("**Event of Default**") under this Note:

   a)   Maker fails to timely pay any amount due to Holder, including, without limitation, any payment due under this Note, the Agreement, or other agreement between Maker and Holder, and payments otherwise due from Maker to Holder under applicable law, and such payment failure is not cured within thirty (30) days;

   b)   Maker materially breaches any other term of this Note or the Agreement or any other agreement between Maker and Holder;

   c)   Maker or substantially all of his or her assets are subject to a liquidation, dissolution, bankruptcy, insolvency, receivership or similar proceeding and such proceeding is not dismissed within thirty (30) days;

d) Maker is convicted of any crime; and

e) Maker, through any act or omission, intentionally or willfully damages or harms Holder or any of its affiliates, employees, agents, or representatives, or their respective property or interests.

Immediately upon the occurrence of an Event of Default, without further notice or demand: (a) any outstanding balance of the Debt shall bear interest at the rate of ten percent (10%) per annum; (b) the entire outstanding amount of the Debt shall be immediately due and payable; (c) Holder may set off any and all amounts due at the time of the Event of Default or that become due with the passage of time to Maker or to any third party on Maker's behalf from Holder, its subsidiaries and affiliates, and their respective successors or assigns ("**Holder Parties**"), including, without limitation, with respect to commissions, bonuses, and expense reimbursement, against the amount due from Maker under this Note; and (d) the Holder Parties may withhold payment of any such amount(s) otherwise owed to Maker or to any third party on Maker's behalf that are due or become due with the passage of time.

Maker agrees to pay on demand all out-of-pocket costs and expenses of Holder (including the reasonable legal fees and out-of-pocket expenses of counsel to Holder) incurred in connection with the collection of the Debt or enforcement of Holder's rights under this Note or the Agreement, and such amounts shall be added to and considered part of the Debt.

**5.**     **Warranty of Note Validity**

Maker hereby represents and warrants to Holder as of the date hereof that (a) this Note is a legally valid and binding obligation of Maker, enforceable against Maker in accordance with its terms, and (b) the execution, delivery and performance by Maker of this Note does not conflict with or contravene (i) any law, rule or regulation binding upon Maker or affecting any of Maker's assets, (ii) any provision of any contract, instrument, or agreement binding upon Maker or affecting any of Maker's assets, or (iii) any writ, order, judgment, decree, or decision of any court or governmental instrumentality binding upon Maker or affecting any of Maker's assets.

**6.**     **Location of Payments**

Payments are to be made to Jones Lang LaSalle Americas, Inc., attn. Chief Financial Officer, 200 East Randolph Drive, Chicago, Illinois 60601, or such other location as may be specified in writing to Maker by Holder.

**7.**     **Choice of Law, Waiver of Jury Trial, Construction, and Advice of Counsel**

This Note has been made and delivered at Chicago, Illinois. Maker agrees that this Note shall be governed by and construed in accordance with the laws of the State of Illinois without giving effect to that state's conflict of laws provisions. Any action for collection on this Note may be initiated in the state or federal courts located in Chicago, Illinois, and Maker consents to jurisdiction and venue in such courts. **The parties knowingly and willingly waive a trial by jury in any dispute arising out of or in any way related to this Note**. Wherever possible, each provision of this Note shall be interpreted in a manner as to be effective and valid under applicable law, but if any provision of this Note shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the least extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Note. Maker is advised to have an attorney review this Note before executing it.

Maker waives all exemptions, homestead laws and rights thereunder, presentment for payment, demand, notice of dishonor, notice of non-payment, protest, notice of protest, and all other notices whatsoever.

MAKER                                    HOLDER

_____     _____
Elizabeth Walker Teague                        By:     Tim McCarthy
                                            Broker Lead

Date: 05/12/2025 _____     Date:_05/12/2025_____

2

# Exhibit F

 SEE A BRIGHTER WAY

July 10, 2026

**VIA EMAIL AND OVERNIGHT MAIL**

Ms. Elizabeth Walker Teague
14 Warwick Road
Mobile, AL 36608
buffwalker@hotmail.com

Re: **NOTICE OF BREACH — NON-COMPETE AND NON-SOLICITATION OBLIGATIONS; DEMAND TO CEASE AND DESIST; DEMAND FOR REPAYMENT**

Dear Ms. Teague:

I write on behalf of Jones Lang LaSalle Americas, Inc. ("JLL" or the "Company") regarding your recent resignation from JLL and your immediate affiliation with COUNCIL Real Estate, a direct competitor of JLL.

You were a party to an Independent Contractor Agreement (IRC Section 3508) with JLL dated January 15, 2014, as amended by the Amendment to Independent Contractor Agreement dated August 1, 2018, Second Amendment to Independent Contractor Agreement dated March 22, 2022, and Third Amendment to Independent Contractor Agreement dated May 12, 2025 (collectively, the "Agreement"). Section 7 of the Agreement, as amended, contains a non-compete provision stating, in relevant part:

> *During the Term of this Agreement and, if JLL terminates the Agreement for Cause or [Teague] terminates the Agreement for any reason, for six (6) months after such termination, [Teague] may not, without the prior written consent of the Company, own, manage, operate or control any business, individual, partnership, firm, corporation, limited liability company or other entity that is engaged directly or indirectly in any business line and in any state or territory in which Contractor was engaged on behalf of the Company within two (2) years prior to [Teague's] termination from the Company, or serve as an employee or independent contractor to any other person or entity that is engaged, directly or indirectly, in that business.*

Critically, the Agreement further provides that "[t]he post-engagement restrictions set forth in this Paragraph shall apply until the Debt set forth in the promissory note(s) described in Exhibit A is fully forgiven (without any repayment by [Teague])." Because you voluntarily resigned from JLL on July 6, 2026, and because the outstanding Debt owed to JLL under the Promissory Note dated May 12, 2025 (the "Note") has not been fully forgiven, your non-compete obligations remain in full force and effect — and, by the express terms of the Agreement, will continue in effect for six (6) months after your resignation.

**Heather Smith Michael**
**Chief Brokerage Relations**
**Counsel**
JLL                                   **T** 404 995 6586
3344 Peachtree Road NE    **E** heather.michael@jll.com
Atlanta, GA 30326             **W** jll.com

**JLL** SEE A BRIGHTER WAY

We understand that, immediately upon your resignation, you commenced work with COUNCIL Real Estate, a business directly engaged in the same business lines, in the same geographic territories, in which you were engaged on behalf of JLL. This is a clear and material breach of your non-compete obligations under the Agreement.

In addition to your non-compete obligations, Section 7 of the Agreement contains a non-solicitation provision stating, in relevant part:

> *During the Term of this Agreement and for 12 months after termination of the Agreement if terminated by [Teague] for any reason or by Company with Cause, [Teague] may not, without prior written consent of the Company, personally or as an employee, stockholder, director, investor, owner, consultant, manager, member, associate, partner, agent, independent contractor or otherwise, or by means of any corporate or other device: (i) other than on behalf of the Company, solicit from clients of the Company or any of the Company's Affiliates any existing or pending transactions or assignments, or solicit or encourage such clients to discontinue their existing or pending transactions or assignments with the Company or reduce their consideration of the Company for pending transactions or assignments, except that [Teague] is not prohibited from accepting or responding to unsolicited calls or contact, including accepting or responding to requests for proposals and requests for quotes; or (ii) solicit or encourage any officer, director, employee, consultant, agent, or independent contractor employed or retained by the Company or any of its Affiliates during the term of this Agreement to leave the employ or retention of Company or its Affiliates, other than through a general solicitation that does not specifically target employees or consultants of the Company.*

Because you resigned from JLL, which constitutes a termination for any reason within the meaning of Section 7, your non-solicitation obligations remain in effect for twelve (12) months following your resignation. We have learned that you recruited Lisa Fawcett, another JLL broker, to leave JLL and join you at COUNCIL Real Estate and that you have solicited JLL clients to discontinue or reduce their business with JLL on behalf of COUNCIL Real Estate, in direct violation of your non-solicitation obligations. Each of these actions constitutes a separate and independent breach of your obligations under the Agreement.

Accordingly, JLL demands that you:

1. **IMMEDIATELY CEASE AND DESIST** any and all activity on behalf of COUNCIL Real Estate or any other competing business;

2. **IMMEDIATELY CEASE AND DESIST** from soliciting or encouraging any officer, director, employee, consultant, agent, or independent contractor of JLL, including but not limited to Lisa Fawcett, to leave JLL, and from soliciting from any JLL client any existing or pending transaction or assignment or soliciting or encouraging any JLL client to discontinue or reduce its business with JLL;

3. **CONFIRM IN WRITING**, no later than five (5) business days from the date of this letter, that you have ceased all such activity and will not engage in any further activity in violation of the Agreement; and

2

 SEE A BRIGHTER WAY

4. **REMIT PAYMENT** in full of the outstanding amount described below no later than August 5, 2026.

You are also reminded that the confidentiality provisions of the Agreement remain in full force and effect and survive your separation from JLL.

**<u>Demand for Repayment</u>**

Separately, your voluntary resignation from JLL also triggered your repayment obligations under the Agreement and the Note. Section 3 of the Note provides that upon your resignation before the Debt has been forgiven in its entirety, "the entire outstanding amount of the Debt will become due immediately and payable within thirty (30) days after the Due Date without further notice or demand." Your resignation date of July 6, 2026, constitutes the "Due Date" under the Note. In addition, you received two performance bonus payments pursuant to the Agreement, each of which is subject to a five-year clawback. Based on your resignation prior to the required five-year period, a prorated portion of each performance bonus payment is immediately due and owing to JLL.

As of the date of this letter, the total amount owed to JLL is $874,080, consisting of:

- Outstanding loan balance under the Note: $486,265
- Unamortized 2023 performance bonus balance: $49,000
- Unamortized 2025 performance bonus balance: $160,000
- Uncovered support obligation: $178,815

JLL hereby demands payment in full of the above amount no later than August 5, 2026 — thirty (30) days following your resignation — in accordance with Section 3 of the Note. Payment should be remitted to Jones Lang LaSalle Americas, Inc., Attn: Chief Financial Officer, 200 East Randolph Drive, Chicago, Illinois 60601, or such other address as JLL may direct in writing.

Please also be advised that Section 4 of the Note provides that, upon an Event of Default, including failure to timely pay any amounts due, default interest will begin to accrue at a rate of ten percent (10%) per annum. JLL reserves all of its rights and remedies under the Agreement, the Note, and applicable law, including its right to recover attorneys' fees and costs incurred in connection with any collection or enforcement action, as provided in Section 4 of the Note.

Please have your counsel, if any, contact me to discuss this matter.

This letter is not intended to be a complete recitation of JLL's rights or remedies, all of which are expressly reserved.

Sincerely,

Heather Smith Michael

cc:     Tim McCarthy

3